By the Court,

Cowen, J.
This is an action by the endorsees against the endorser of a bill of exchange, at four months, drawn by the Bank of Western New-York, an association under the general banking law. The defence was, that the bill issued contrary to the act of 1840. (Vid. Sess. Laws of 1841, p. 358, § 4, and Sess. Laws of 1840, *243 p. 306, § 4.) It is answered, that the statute which prohibits the issuing any bill or note except such as- shall be payable on demand, does not extend to bills of exchange. Perhaps it does not in terms. It may be confined to ordinary bank bills and notes, and leave an opening to issue and circulate post bills of exchange, while it prohibits post bank bills and notes. Acts to prevent frauds sometimes use such narrow words that, if literally construed, they may be easily evaded ; and I shall not stop to enquire whether this he so with regard to the statute in question. I am of opinion that negotiable paper, in whatever form, issued by institutions under the general banking law, except with the sanction of the comptroller, is a fraud upon the statute by which they were created, and upon the public for whose benefit they were restricted to circulating paper secured by stocks or mortgages. This we held in Safford v. Wyckoff(1 Hill’s Rep. 11.) It is now said we were mistaken in supposing that the original statute meant to restrict the issue of any negotiable paper, except ordinary bank bills or notes sent out to circulate as money. I then thought this argument answered by the fact, that bills of exchange may be used as a circulating medium; and I insisted that the statute should not be defrauded by a mere change in form, of the paper issue. The statute of Marlbridge, ch. 6, forbade feoffments to the heir, to defraud the lord of his fee in his wardship. And this act was so construed as to comprehend all other modes of conveyance— grants, lease and release, confirmations, fyc.—having the same end in view. (2 Inst. 111. Dwarris, 721.) But it is insisted, that the supposed fraud cannot be so effectually practiced by bills of exchange as by notes or bank bills. That may be. The lord could not be so effectually defrauded of his wardship by a confirmation as by a feoffment, which was the stronger mode of conveyance; but if confirmations had been received as .an effectual evasion of the statute, the parties interested in carrying on the fraud would soon have dropped the feofiment and resorted to the confirmation, simply because they found the courts *244 would give it effect. It is true, that the drawer of the bill in question does not, on its face, stand primarily liable, as the bank would do if it had made a note ; and, in this respect, the bill is not the same as a bank bill issued by the drawer. Yet by issuing it without funds in the hands of the drawee, or by adding a waiver of demand and notice, the bill would have been in effect precisely the same when endorsed in blank by the payee. The bank might so have shaped the bill as to become an acceptor; and issued it in that form. Even without any such device, bills of exchange, especially those payable at a future day, answer the purpose of a circulating medium to a considerable extent; while with those devices, (and they can always be superadded and be made matter of general notoriety,) the bank may become and be universally considered primarily liable as upon its legal paper. In short, by making ourselves judicial parties to such bills in any form, we sanction a fraud upon the statute to a limited degree; ancl we give life to a sort of paper which in its mutations may and would become an instrument for supplanting entirely the bank bills so carefully sought to be secured by . the original act, and improved by that of 1841. To pronounce this attempt lawful, would, in my opinion, be effectually to sanction a fraud upon both statutes.
Much force was' supposed, in argument, to lie in the denial that bills of exchange are used as a circulating medium ; and it was said that in Safford v. Wyckoff, the argument rested on the assumption that they are. But it will be seen that the argument there was rather that, by giving effect to this sort of paper, we should make them a circulating medium by consequence. Such construction ought to be put upon a statute as does not suffer it to be eluded. (15 John R. 381.) Had it been said they were already a circulating medium, however, I apprehend the remark - would not have been far from the fact. In Gibson v. Mi-net, (1 H. Black. 618,) Lord Chief Baron Eyre said, speaking of honest bills, “ they are signs of valuable property and equivalent to specie, enlarging the capital stock of wealth *245 in circulation.” Bills already equal to specie, and capable of circulating as freely, might, without any great degree- of inaccuracy, be treated as a circulating medimn nearly equal, at least, to the best lawful bills of these new banks. The continuation of the chief baron’s argument is not altogether without application to another view of the case before us. He calls upon -the merchant to contrast the sort of bill which he was describing as equal to specie, with “ that false coinage of base paper money which has been of late forced into circulation, the use of which' is to encourage a spirit of rash adventure;. a spirit of monopoly, a spirit of gaming in commerce, luxury, extravagance, and fraud of every kind, to the ruin and destruction of those whose credulity can be practised upon by a false appearance,” &c.. Were it not for the date of the report, one would almost suppose his lordship to have been speaking of the times in which we live. It is to avoid this false semblance of value in our circulating medium, that the legislature have fenced around the institutions created by the general banking law, both by the charter of their creation and tire act of 1840. It is our duty so to construe these statutes as to suppress the mischief intended by them to be avoided, and advance the remedy which they intended to interpose.
There is clearly nothing in the objection that the act of 1840 is unconstitutional.
But it is objected that, however illegal the bill may have been in its origin, there is no evidence that the plaintiff took it with notice of the defect; and I supposed in Safford v. Wyckoff that perhaps something was necessary beyond the face of the bill, to" affect the endorsee with notice, though I thought there was enough in that case. What I said there was obiter; and the question was not debated upon the argument. It was quite equivocal upon the case whether the objection of illegality was raised by the endorser; whether the objection was not confined to the drawer. The case has since been more critically examined, and we have concluded that its better construction, in *246 this respect would confine the objection to the drawer; and we modified the rule granting a new trial so as to confine its effect to the draw'er only. This leaves the question entirely open as an original one, whether the endorsee is bound to take notice of the illegality. It is said that this stands written upon its face. But that is not directly so. The holder sees that the hill, being issued by a bank, comes within one of being illegal; but, for aught he may know, the bank was such an one as, under the law of this state, might draw a negotiable bill. There are such. Is it, however, consistent with the vigilance which prudent men ordinarily exercise in the conduct of their affairs, to suppose as matter of evidence, that the purchaser of a bill of exchange, purporting to'be issued by a bank in this state, would not, by that circumstance, he at least led to a suspicion and aroused to an inquiry whether the institution were not a bank under the general law? Such an institution has a distinctive name, which is generally known. The taker of the bill probably knows it from the publicity of that name; and his interest would dictate an enquiry into the circumstances of the bank in point of solvency. Such would be the prudent and ordinary course of business, which we are to presume, as matter of evidence, was followed; and that could not well have been, when; in con-. nection with this, we look at general information and the intimation by the bill itself, without acquiring a full knowledge that the institution was of a character inhibited from issuing the bill as an act contrary to public policy. There is.a considerable class of cases which hold such circumstances as ought to excite suspicion in a prudent and careful. man to be equivalent to notice. (Chitty on Bills, 278, a, Am. ed. of 1839.) On reflection, therefore, I am of Opinion that, upon obvious grounds of presumptive evidence, we ought, in the case at bar, to intend knowledge. Another ground of presumption, more artificial, I admit, but perhaps, equally available in law is, that all the banks in the state authorized to issue bills of exchange are created by public laws generally, in virtue of. acts declared to be public by *247 themselves; but whether so or not, public in their own nature, because affecting the currency of the country. (3 Cowen, 686. 4 Cranch, 384, 388. 1 Caines’ Cas. in Err. 93.) The consequence is, that every citizen is bound to know and distinguish them from banks under the general law.
I am of opinion that a new trial should be granted, the .costs to abide the event.
New trial granted.